The second case this morning, well actually the next matter this morning, involves consolidated cases. They are cases 4, 1-6-0-8-4-0, 8-4-1, 8-4-2, 8-4-3, and 8-4-5. I think I got that right. Thank you, Justice Harris. And the title is In Re T.L. People of the State of Illinois v. Jed Lomprez. For the appellant, we have Mr. Alvarez. And for the appellee, Allison Paige Brooks. Mr. Alvarez, you may proceed. I place the court this morning. Counsel. I'm here representing Jed Lomprez, who is seeking to have his five children returned to him, and to return to him the right to raise those five children. Those rights, those privileges in him were taken away when the trial court entered its order on October 16, 2016, terminating his parental rights. We believe that the manifest way of the evidence, as discussed in our brief, dictates that the decisions finding him to be unfit, and that it would be in the best interest of the children that his rights be terminated, should be reversed, and that the matter be remanded to the trial court for further proceedings. When Mr. Lomprez testified during the best interest portion of these proceedings, he clearly testified and admitted that he began the whole process when his children were initially taken from him in the wrong way. He felt he admitted he was difficult to get along with, that he did not cooperate as perhaps he should have. But there were reasons for that. In October of 2014, pursuant to a request by the Department of Children and Family Services, both he and his wife submitted to a psychological evaluation. The psychologist returned a report that advised the court in the dispositional report, as well as the department, that both Mr. Lomprez and his wife, because of their lower intellectual level, would have a difficult time understanding and completing the tasks that were going to be assigned to them if they were going to have their children returned to them. From the outset, it's our position, and as I've argued, that the department and its agents, different agencies that they delegated their duties to, ignored that advice from the psychologist. Psychologist also indicated that she felt that Mr. Lomprez was suffering from post-traumatic stress disorder as a result of his service to the United States in the United States Army and in combat in Iraq. He testified to that. I believe that's set forth in the record. There's no reason to go through that at this point in time. But that genuinely affected him. The psychologist initially felt that he was suffering from post-traumatic stress disorder. Again, I felt that that was ignored. If you look at the requirements in each of the service plans that preceded the findings of terminating his rights, nowhere does the department state or acknowledge he suffered from post-traumatic stress disorder until he chose, he initiated the process of contacting the Veterans Administration and applying for disability benefits. Even after that was done, and even after he advised the department that he was seeking counseling through the Veterans Administration to address the issues that affected his personality and the way he dealt with people because of his finding of post-traumatic stress disorder, the department still found that he was unsatisfactory with respect to obtaining counseling and treatment. The department at no time and across examination, their representative admitted to me, attempted to subpoena the records so they could determine whether or not he was going through the counseling. When asked, the department simply said, well, we tried and they wouldn't give it to us. However, when I subpoenaed the records and gave them to the court, those records were provided. The department could have done the same thing. As I've argued, I believe that demonstrates that from the outset, Mr. Lompres and myself believed that the department had made the decision that he was not an appropriate parent. We were not going to allow him to have his five children back. We aren't going to allow him to nurture and to raise his children. At the outset, they initiated tenants in his service plans, number one, well, number one, parenting classes. Both he and his wife completed parenting classes twice. I've addressed the issue of counseling. He readily admitted when he testified that he did not initially seek counseling because he didn't understand the symptoms, because he felt that other veterans, I think he testified, that other veterans perhaps deserved the benefits more than he. But he ultimately obtained the counseling and he still was never found to be satisfactory, even though he was going through the counseling. He was required not initially to submit to toxicology reports or testing, excuse me. It was never a part of the service plans until he raised that issue with the caseworker and said, I think that you should have the foster father to my four daughters tested because I believe that he is using drugs. They did not require that, despite the fact that he was a felon, a convicted felon, the foster father. Rather, they then began to ask and demand that Jed Lomprez submit to toxicology requests. What's the problem with that? The problem with requiring him to do it? To question him. Well, first, there was no evidence of any substance abuse. No evidence of it whatsoever. Nowhere in the proceedings will you find anything that indicates that Jed Lomprez or his wife were engaged in using controlled substances. And that also goes along with the fact that the department and its surrogates placed in the service plans requirements that they submit to domestic violence assessments and counseling. They ultimately went through those, but the issue is the only reason they put those in is because they suspected it. There was never any proof of it. No one ever came forward and testified that there was any domestic violence between Jed Lomprez and his wife, or there was never any evidence that was submitted that Mr. Lomprez physically abused any of his children. He objected to those two because, as he said, as the toxicology reports are testing, that he felt those were for criminals, and he did not feel that he should have to submit to those when there was no evidence of the same regarding his... So what? Well... Therefore what? He decided he didn't want to do it. Therefore, okay, gee, we're sorry we asked. I think that that goes, that's easy to say, but we're ignoring that at the time they were demanding and requesting that he do this, he was suffering from post-traumatic stress disorder. Does that allow him to... Okay. Therefore what? Well, again, I'll explain. If you're suffering from post-traumatic stress disorder, whether it's the result of physical abuse or any other type of abuse or service in the military, it does not mean that you're going to be able to comprehend the meaning of any request being made... Counselor, we're concerned here with the children. What's that? We're concerned here with the children. I'm sorry for your client's condition. We're concerned, like the trial court, with the children. Well... How do we address their needs and what we have to do for them? Then let's move on then to the best interest portion. Okay. In the best interest portion, again, the standard is by preponderance of evidence for the trial court. However, all I heard during the proceedings below from DCFS and from the trial court judge himself, while we have to ensure stability, we have to ensure security for the five children. I submit that none of that, based upon the court's ruling, was supplied. First of all, let's look at the four daughters. How are you going to supply security, closure for these four children when they live one block from their mother and father? When they see their mother and father every day, and as the foster mother testified to and as my client testified to, as soon as they see them, they run to their father, call him daddy, they say they love him, and they want to go into his home. Does that stop? Does that stop once the court enters its order on October 16, 2016? It does not. Because you can't tell those four daughters... You can't tell them, well, turn it off. That's not your father anymore. Because I'm sitting here behind the bench and I say he's not your father, therefore you don't love him anymore, therefore you don't want to see him anymore, therefore when you go to family functions, because the foster mother is the sister of the mother to the four daughters, you don't need to go around them, you don't need to express any love at all, because I've said it's in your best interest that you not talk to your father or love him. Both sets of foster parents, well, not just the mothers in each case, excuse me, testified that the children loved their father and mother, they called them daddy, called her mommy, and that they were sure that they still loved their parents. They both testified that, and particularly the sister, Angela Allen, testified that the children go to them, they gravitate to them. So I submit to the court, that is not in the best interest of the children. Another issue, if we're looking for stability for these children, if we're looking for stability for them and security, who do we look to to support the children? The state or the parents? Jed Lomprez, as a result of his treatment for post-traumatic stress disorder, he's able to help his wife, he's in a better position to help his wife, he testified to, and it was not contradicted, that his income, expected income this year, was going to be somewhere around, I think it may have been $46,000 between his employment, full-time employment, and his VA benefits. He expected his wife to make somewhere between $10,000 and $17,000 a year. He testified that their life has changed, that his life is in order, that they're able to support their children. He talked about the fact that when he gets his children back, he's going to purchase a van so they can transport the children. The court then terminates his rights, and the department is seeking to have Angela Allen and her husband, Angela Allen and her husband, then adopt the children. The uncontradicted evidence is that Angela Allen babysits from time to time, and her husband does part-time jobs. Part-time jobs. So, as admitted by the caseworker, under cross-examination of my cross-examination, she said the state's going to wind up supporting the children. Is that in the children's best interest? Does that teach them how they're supposed to go forward and try to earn an income of their own and attain a job? It does not. I submit it's not in the children's best interest. The visitation specialists testified, all of them testified in this matter, as to the interaction of the Lomprez parents with all five of their children during the entirety of this case below. Every one of them testified that there were essentially no problems, that the parents were able to discipline, they brought appropriate food, they entered into entertainment activities with the children appropriately, that there were no issues whatsoever. But despite that, a caseworker, and I can't think of her name right now, it escapes me, testifies that they are rated unsatisfactory as to visitations in every single service plan that was put forth in this matter. How can that happen? I asked her, did she read the notes? She did. But despite that, she ignores the visitation specialist's testimony and what was actually in those notes. I submit to the court that that demonstrates that Ted Lomprez and his wife are able to parent their children, are able to nurture their children, and love their children. I also submit to the court, and I know it was rather long, but we submitted as Respondents Exhibit No. 1, a video compilation of all of the visitations that these two people had with their children. There were short little vignettes of visitations and different activities, but it showed the interaction between these children and my client, Jed Lomprez, as well as his wife. It was normal activity between a parent and a child. Children didn't shy away from him. They didn't attempt to run away from him. There was no crying if he approached them, only laughter. All of those things demonstrate that those five children and my client and his wife, they were still a family unit where there was love going back and forth. But my client, in my estimation, in cross-examining all of the DCFS agents and employees, it was clear to me and to my client that they just didn't like him. And it was his fault. He readily admitted that, that in the beginning he fought. But they came to understand, once he started receiving treatment and started to take his medication, what was, as he said, he began to be able to interact with people, take more part of the community and understand what he needed to do. And if you look at the testimony of the caseworkers that visited the home, one of the things that was, they were very critical of the Lomprez, had to do with their house. In the beginning, it was, he says, they say cluttered, he says not organized. But in March and April of 2015, two visits to the home, the home was found to be acceptable to the department. But despite that, despite that being put in notes, he's still found to be unacceptable. Unacceptable. And that just demonstrates that the department, no matter what Jed Lomprez did or his wife did, they were going to recommend that the parental rights of these two people be terminated. And I believe that the... Well, are you suggesting the GAL was in on it too then? I'm suggesting to the court that perhaps the GAL didn't spend as much time or perhaps ignored some of the evidence. I don't know what motivated him in his report, but I've described for you, you've had the record. This is, I've never been in a termination, I've been in many termination cases, and this one, the volume of evidence and testimony that was put forth ignored it. If you look at his GAL report, he didn't talk about the video evidence. He didn't talk about the fact that the children see their father and mother every day, that they love them, that they call them. He didn't do that. All he did was he goes out and he says that the children are doing fine in the home of Angela Allen, as well as the Stoomers. That's what he did. And I submit to the court that he ignored much of the evidence that I've argued to the court today. I believe if you take all of that into consideration, that number one, that the unfitness finding should be reversed, and as well as the best interest. Even if, let's assume, and I don't agree with it, but let's assume this court agrees that the parents were unfit, that the trial court was correct. That does not mean. Correct by accepting your stipulation, you mean? No. I did not stipulate that he was an unfit parent. I did not stipulate that, and neither did my client. We stipulated that the court could make its decision based upon not just the reports that were put in and the direct testimony of the witnesses, but the cross-examination that I conducted as well as Mr. Smith. That's what we stipulated to. That did not abrogate the trial court's responsibility to still weigh the evidence in a fair and impartial manner itself. But even if this court agrees that there was clear and convincing evidence that my client was unfit, the best interest portion, the best interest evidence that was submitted to the court, dictates that it is not in the children's best interest that their parental rights be terminated. So if the court has any other questions, I'll be happy to answer them. I see none, but we will have rebuttal. Okay. Ms. Brooks? Pardon my cold turn. I'm Allison Paige Brooks, and I'm appearing on behalf of the people. May I please report? The standard review is deferential on both issues. The manifest weight of the evidence is a difficult one to overcome, especially on this record where there is a stipulation that this court should interpret as a stipulation of fact because of the intent of the parties, as disclosed by the record, was to get the trial court to accept the evidence that was listed in the stipulation. And because the trial court had to accept that evidence, it's not simply just an evidentiary stipulation that's a substitute for testimony. It was requiring the trial court to accept it when making the ruling, and that is different because in an ordinary case where there's simply the stipulation is a substitute for testimony, the trial court can either accept or reject the testimony. But a stipulation of facts cannot be controverted by a party, particularly like here on appeal, where the respondent father's theory is that the argument seems to be, to the state at least, seems to be that he's saying the trial court should not have accepted the stipulated facts, which the facts to which he stipulated the trial court had to accept. Well, Mr. Lampres objected at every stage to termination of parental rights, correct? Yes, that's true. But that would be inconsistent then with a stipulation as to the finding of unfitness, wouldn't it? I agree with the part of respondent parent's part, respondent father's argument, that he did not specifically stipulate to his unfitness. He did not do that. He stipulated to facts, facts, of course, which were very promptly accepted by the trial court as clear and convincing proof of his unfitness. So with that sort of distinction, he did not affirmatively consent to the finding of unfitness or termination. He did not, he did object to it initially to the point where this stipulation then calls into question what exactly was going on. Well, to be more clear, if this were, and I think we've all had that experience, if this were the equivalent of a stipulated bench trial, for instance, and I've had a person as a trial judge where the parties would say, okay, we will stipulate that this will be the evidence, and then the defendant would say, and given that stipulation, here's why it's not enough to convict my client, says the defense attorney. If that was the argument, there was no argument here. So that was my question. Yes. In other words, though sometimes there'd be a stipulation and, yeah, we stipulate that's the evidence, and there's no further argument, but having stipulated that's the evidence, you can see now, Judge, why it's not enough to convict my client, or in this case you can see why it's not enough to establish unfitness. Was any of that ever said? No, and it is possible for a person who stipulates two facts to controvert the question of guilt and make that argument. Here the agreement was to not have any testimony, contrary testimony, and they didn't have any argument against the finding of unfitness, and the trial court even later characterized this as having been an agreed order. So it seems like, at least from the trial court's perspective and what the record disclosed, that this is somehow the parents, after hearing extensive testimony, running up the white flag and saying, essentially saying to the court, let's move on to best interests. All right, so let's just assume that we're dealing strictly with stipulation as to facts as opposed to the finding of unfitness. What is it that supports the trial court's finding of unfitness here? And if you could then go from that to the best interests part of this. Sure, Your Honor, and the parts of the stipulation, the facts, include the failure to attend the medical appointments during the time periods which are included within the nine-month periods for the children. One of the reasons why the children were removed was because of lack of medical care and failure to thrive for the two infants and lack of medical care. I think there was a rash, for example, that wasn't treated for one of the minors, and the other two were removed on the allegation of anticipatory neglect. So there is removal for lack of obtaining those care. And for the parent's father, in particular, to fail to attend the medical appointments constitutes evidence of lack of reasonable efforts to correct the conditions. That's one ground. The other ground is the lack of reasonable progress towards returning the children within the statutory periods. And the stipulated evidence shows, along with specifics, the overall findings for the client service plans during these applicable nine-month periods for all the children were unsuccessful. And that's something the trial court had to accept, and his argument until as well, that these people who rated the plans were biased against him, and therefore these ratings should not be accepted. Well, he stipulated this should be accepted by the trial court when making a finding as to his fitness. And the client service plans were rated as unsuccessful, so it cannot be said that the children were close to being returned to him in the near future, which is the standard for reasonable progress. And also because reasonable progress is an objective standard, his issues with respect to saying that, for example, they failed to obtain his VA records and get him appropriate health, for example, for a PTSD as a result of his military service that he incurred, that is something that is not considered with respect to reasonable progress. It may give him an excuse on reasonable efforts, but does not constitute an excuse for his failure to make reasonable progress with the return of the children within the appropriate time required by statute. Also, he says that he did change. He got a job. He was able to have support for the children. He was taking his medications. But if this happens after the end of the statutory nine-month period, it doesn't help him for purposes of the unfitness finding. It's only going to go to best interests. So the evidence that shows with respect to the unfitness finding has to be confined to the statutory nine-month periods, which were determined by the trial court at the outset of the hearing, and they differed for the different children. Also, he's saying that there is no evidence of substance abuse, but if this was suspected as a result of his behavior, behavior which is now known to have occurred because of PTSD, for example, but it means back then, though, it was not known for sure whether there were substance abuse issues in the household, and it's reasonable for the providers and also the court, through enforcing the requirements of cooperating with what the providers are asking them to do, to confirm whether or not substance abuse is an issue and require the parent to do drug drops, toxicology screens. And just simply saying, well, that makes me seem like a criminal and I shouldn't have to do that, is not an excuse. That's not an appropriate excuse when necessary to protect the children, make sure they're going to be in a safe home, and requiring something like that of the parent is reasonable when there are behavioral issues that make at least rise to the level of suspicion that there is drug use or possible drug use going on in the home. Is it the same thing for the domestic violence assessment? Well, domestic violence as well as what the observations would be, like yelling, for example, could make suspicions that there are somehow inappropriate power relationships or other sorts of factors in play that could be helped by domestic violence counseling, requiring them to undergo an assessment. An assessment then could result in a recommendation for them to receive counseling. So requiring an assessment for domestic violence or requiring an assessment for substance abuse, and then requiring them to follow any recommended services that are recommended as a result of participating in those assessments, that is reasonable for the trial court and for the case workers to require parents to undergo as part of the process of having their children returned to make sure that it's going to be a safe environment for the children. I have a question in regards to the procedure employed here. It looks like there were multiple days of hearing on the petition. Yes. And then ultimately it culminated in a stipulation of facts that the trial court then was to utilize in making a fitness determination and then the best interest determination? Or was there then a hearing on the best interest portion of it? I think the best interest was different. I'm not sure it was at that same point. Just as to the fitness determination, was the trial court only to consider the facts that were stipulated to or was it made clear whether the trial court could also consider the testimony that had previously been presented? I'm not sure why there were multiple days of hearings and then ultimately stipulated facts. I'm not sure how all of that played out. But what could the court consider here? It's a good question because it's not obvious from the actual wording of the stipulation that that was what was intended to consider exclusively this evidence and ignore everything else that had already been heard over several different hearings. I'm not sure that that's what the intent was or that's what the trial court was expected to do. However, to stipulate that facts have to be accepted, when there may be some other contrary facts or evidence that may tend to contradict that, that had already been heard, for example, then it seems like the stipulation of fact would override anything to the extent there would be a conflict that had already previously been heard. So that seems to be more of the case. Not that the trial court had to ignore everything else, but to the extent that it may have been a conflict, it seemed like the intent was the stipulation to control. So with respect, the parent, the responding father, is still to persuade that the unfitness finding was against the manifest weight of the evidence. And so therefore, I'd like to move on to best interests. Children of widely varying ages, the two older children, who were interviewed by the court in camera, and also are old enough to have some sort of input in terms of what the trial court should consider as to their wishes of where they want to live. They wanted to live with their foster parents, and especially Emily, the oldest, who was scared of the responding father and hated him. So that seems to be very powerful, at least as her. So the responding father is saying that, well, he's changed, but in all the time it took from the time this case was open until the time he finally says he's changed, things have happened. Attachments have been made, particularly for the three younger children, Elizabeth, Tayla, and Jet. The ones that were taken, for example, close to infancy, they are much more significantly bonded with the foster parents, which is to be expected, because responding parents are getting no more than supervised visits, which are just simply occasional meetings with them. They're not living with them full time. And so the fact is that during this time that he is supposedly getting his act together, these things are happening. These children, many of them have special needs, and they are thriving a lot more in the foster homes where they're getting complete support according to the evidence. And that is in contrast with responding parents who still have unresolved issues, haven't completed their services, mentioned domestic violence in the best interest report, and the risks that the children would not receive the complete support they were getting given their special needs in the home if they were placed with the respondent father and his wife. So there were no concerns expressed about the foster homes. Those foster parents were willing to adopt, and so the attachment levels were higher in the foster homes. The children were not upset at the end of the visits when they had to leave the respondent father and go with the, for example, the girls went to the aunt and uncle. And even though they knew that their foster parents had aunt and uncle, and even if they lived close in proximity to the respondent parents, I think there was an allegation here, the argument, that they somehow wanted to go into the home of the respondent father, and the evidence was that the foster mother had testified that they never asked to go into the respondent father's home, and that was Record Volume 36116. And so even if they lived close and knew him as their father, and even called him daddy or loved him, it still was not enough to overcome all these other factors. The show that... You actually mentioned about the close proximity of both foster parents and the parents. Yes. I'm just curious what your thoughts on how that should impact the court's decision, if at all. Well, the court definitely took it into consideration, and waited as long as all the other evidence and the factors, and made a very careful, very considerate decision, and failed it not to be harmful that they were there. I mean, these girls were old enough to know who their parents really were. They knew that they were living with an aunt and uncle, and the fact that they would encounter them in the street, have a brief hug, if the foster parent thought that that was not detrimental to their welfare, the trial court could accept that and say that this is an okay arrangement. This is their best chance to be adopted by a good family, and that this serves their permanency, and this is a good placement for them. And that's something the trial court can decide, and that's not against the manifest way of the evidence. You heard Mr. Alvarez make reference to financial circumstances. What's your response? I believe he's mentioning the fact that there's some sort of adoption subsidy, so he's thinking that some of the children are going to be state supported, because of the adoption subsidy. But that's something that's going to take into account in any sort of case, where there's an eventual adoption, like all these termination cases are, hopefully going to end in adoption. So I don't think that's something really that is to be considered, from the perspective of what's really best for these children. In other words, who's paying for their support, doesn't really sort of get to where they're most loved, or where they feel most secure, where their attachments are. And so I think that's kind of not really all that relevant. The trial court did have a chance to look at the video of their visits, and their interactions. I think there was a testimony from one of the case workers, Shannon Nelson, that one of the visits that she saw was chaotic, and I think that was maybe the only visit she saw. But it's not completely clear that this is somehow going to be a safe environment for them to have been placed in, with the respondent father, simply because of what some of these case aides were watching during supervised visits, realizing that they would have to be placed there full time, essentially, and not supervised anymore. And so with these unresolved issues, but I think it's more about the fact that they're thriving in the foster homes. That's where they, especially the older children, wanted to be. That's where the younger children, especially, were most bonded, because of their ages when they were removed. That's mostly, I think, what the trial court has to look at. And that was appropriate, and I think respondent father's not met his burden of showing that it is against the manifest way of evidence on any of the five best interest findings. So for that, I would like to request this court to affirm and entertain any other questions. Thank you. I don't see any questions. Thank you. Is there any rebuttal? I'm just going to hit these points. More than one of the visitation specialists talked about it being chaotic. But also, the transcripts demonstrated, the testimony demonstrated, that they then explained that it was chaotic, because you had five young children put into one place, and that these five children were very active. That was the chaotic part. Not that it was my client's fault or the mother. They were very consistent in saying, testifying, that these two parents were able to deal with the children, discipline them, and control the environment, as far as feeding and entertainment. My recollection, of course the record would demonstrate otherwise, but my recollection is that only one child was interviewed by the judge, and that would have been Emily. Contrary to what counsel's argument was that she hated her father, there was a period of time when both the mother and father testified that in the spring of last year, they separated over the pressure of what was going on regarding the children out of the home. They separated for approximately a month. Angela Allen told the daughter, the eldest daughter, what was happening. The daughter, at that point in time, made the remarks regarding her father. However, the caseworker, the last caseworker, testified very emphatically that once she found out that her parents weren't getting divorced and they were back together, that her feelings regarding her father, as far as hating him and hostility toward him, had dissipated and things were back to normal. As far as the attachment issue, I don't know that any of the children were ever evaluated by a counselor or psychologist as to whether or not they were totally attached to the foster parents and didn't want anything to do with their parents, didn't want to live with them. Perhaps that would have been a good idea. But despite the arguments of counsel, the physical facts are, as I've argued to the court, the children, particularly the four eldest daughters, wanted to go into the home. Counsel ignores the testimony of the parents that when the children tried to go into the home, that Angela Allen made them come back. They love their parents. They've demonstrated that they want to be with them. I feel also that the evidence supports the proposition that both parents are able to parent these children. And if they can do so with the help of the department and the state of Illinois, as they're helping each of these foster parents, that perhaps they can do the same job as the foster parents are. I recognize that we've spent most of the time here on the issue of fitness, particularly with the stipulation, but I want to remind the court from my perspective as being there, and listening to the court, that the stipulation was not stipulating that my client was unfit or that the mother was unfit. We stipulated as to the evidence, the matters that the court can take into consideration in making its decision as to fitness. Did you then argue that, Judge, having heard all that, you can see why the evidence is not adequate? We did ultimately. That's why we're here today. And that doesn't preclude us from arguing that. Yes. We did ultimately. That sounds like... It sounds like... That's rather less than a yes. All right. Let me go a little farther as to why we entered into the stipulation discussions with our clients. Because we felt... Mr. Alvarez, let me just ask you this question. Sure. I was a trial judge. Sure. I have a lot of sympathy for the trial judge. I hear the parties make a stipulation. It's unclear, perhaps, to me whether this is a stipulation as to the overarching claim or merely as to the evidence. And if it's merely as to the evidence, then I would expect the respondent, in this case your clients, to say, See, Judge, yeah, we're going to stipulate. That's all the evidence you have to consider. But it's not enough, and here's why. Does that then vitiate the trial court's responsibility in an important issue such as this? The first question is, did you make that argument? Well, you know I didn't make that argument. Otherwise, you wouldn't be asking it. No, I haven't searched the Record Council. Maybe I missed it. That's why I thought we were here. Okay. So you didn't make that argument, but your claim is that even in the absence of that argument, the trial judge has to evaluate the evidence as if he did. If I'll answer the question. Throughout, one of the other justices brought this up, throughout these proceedings below, we objected every step of the way. If you read the record, you'll see the number of objections that I raised, particularly with respect to it. Did you jump into grounds the evidence wasn't sufficient? Again, my position is that we stipulated because that was what we wanted the court to make its decision on. It didn't do away with the court's responsibility to weigh the evidence in a fair and impartial manner. Now, my client and I decided early on that we didn't feel that was going to happen. You've answered my question. All right. So, again. Your time is up. You can finish your thought. My thought is this. Again, I don't want to feel that the court should ignore the best interest arguments in this case, no matter what the fifthest decision is. Understood. Okay. Thanks to both of you. The case is submitted. The court stands adjourned.